UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – – X

THOMAS JERMYN, on behalf of himself
and all others similarly situated,

        Plaintiff,

  –against–

BEST BUY STORES, L.P.,

        Defendant.

– – – – – – – – – – – – – – – – – – – – – – – – – X

CIVIL ACTION NO.  08 CV 00214

ECF ACTION

**DECLARATION OF
JENNIFER G. DAUGHERTY
IN SUPPORT OF DEFENDANT
BEST BUY STORES, L.P.'S
MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS
CERTIFICATION**

**FILED UNDER SEAL**

Jennifer G. Daugherty, being first duly sworn upon oath, deposes and states as follows:

1.    I am one of the attorneys representing Defendant Best Buy Stores, L.P. in this case. I make this Declaration in support of Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification.

2.    Attached to this Declaration as Exhibit 1 is a true and correct copy of excerpts of the deposition transcript of Thomas Jermyn.

3.    Attached to this Declaration as Exhibit 2 is a true and correct copy of the deposition transcript of Cynthia Cox-Feeney, being filed under seal.

4.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed in Minneapolis, Minnesota, this 25th day of June, 2008.

Jennifer G. Daugherty

80155253.1

# EXHIBIT NO. 1

THOMAS JERMYN,  MAY 2, 2008

Page 1

```
 1
 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    - - - - - - - - - - - - - - - - - - - - - - X
      THOMAS JERMYN, on behalf of himself and
 4    all others similarly situated,
 5                        Plaintiff,
                                          Docket No.
 6         against,                       08 CV 00214
 7
      BEST BUY STORES, L.P.,
 8
                        Defendant.
 9    - - - - - - - - - - - - - - - - - - - - - - X
10    DATED:    May 2, 2008
                Chestnut Ridge, New York
11                9:10 a.m. - 1:20 p.m.
12                Patrick M. DeGiorgio, Reporter
13
14
15
16                     DEPOSITION
17                        OF
18                   THOMAS JERMYN
19
20
21
22
23
24
25
```

THOMAS JERMYN,  MAY 2, 2008

| Page 6 |
|---|
| 1        THOMAS JERMYN |
| 2  Q.   Did that case go to trial? |
| 3  A.   No. |
| 4  Q.   Did it settle out of court? |
| 5  A.   Yes. |
| 6  Q.   Who was your attorney in that case? |
| 7  A.   Craig Langer. |
| 8  Q.   How do you spell that last name? |
| 9  A.   L-A-N-G-E-R. |
| 10 Q.   Where is Mr. Langer? |
| 11 A.   He's in White Plains. |
| 12 Q.   A firm in White Plains? |
| 13 A.   Yes. |
| 14 Q.   Since that time, have you given a statement |
| 15       for any type of lawsuit? |
| 16 A.   No. |
| 17 Q.   The reason why I asked you if you had your |
| 18       deposition taken before is just to go over |
| 19       some of the ground rules.  Your attorney |
| 20       helped me out already here by telling you |
| 21       that you have to answer verbally because we |
| 22       do have a court reporter here.  Okay? |
| 23 A.   Okay. |
| 24 Q.   You either need to say yes or no and not |
| 25       just shaking your head. |

| Page 7 |
|---|
| 1        THOMAS JERMYN |
| 2  A.   Okay. |
| 3  Q.   If there's a question that you don't |
| 4        understand or I don't make it clear, please |
| 5        ask me and I'll rephrase it. |
| 6  A.   Okay. |
| 7  Q.   I'll try to wait until you are done |
| 8        responding before I bring up another |
| 9        question and likewise so we are not talking |
| 10       over each other. |
| 11 A.   Okay. |
| 12 Q.   Do you understand that you are under oath |
| 13       today, sir? |
| 14 A.   Yes. |
| 15 Q.   We've already asked for your address.  How |
| 16       long have you lived at the address you |
| 17       provided to the court reporter? |
| 18 A.   Two years. |
| 19 Q.   What was the city again? |
| 20 A.   New York. |
| 21 Q.   You live in New York City? |
| 22 A.   Yes. |
| 23 Q.   Where did you live before that? |
| 24 A.   New York City, another address. |
| 25 Q.   What was your previous address? |

| Page 8 |
|---|
| 1        THOMAS JERMYN |
| 2  A.   300 East 40th Street, Apartment 7N, New |
| 3        York, New York 10016. |
| 4  Q.   How long did you live there? |
| 5  A.   One year. |
| 6  Q.   Before that? |
| 7  A.   315 East 88th Street, Apartment 5H, ten |
| 8        years. Ten, eleven years. |
| 9  Q.   So you lived at that address for ten or |
| 10       eleven years until what year? |
| 11 A.   I think it was 2005, and then I moved to 300 |
| 12       East 40th Street and then I moved to where I |
| 13       live presently, 320 West 119th Street. |
| 14 Q.   The address you lived at for ten or eleven |
| 15       years, is that where you lived in May 2005? |
| 16 A.   Yes. |
| 17 Q.   Could you repeat that address just because I |
| 18       didn't get that down? |
| 19 A.   300 East 40th Street. |
| 20 Q.   Have you lived in New York City all your |
| 21       life, sir? |
| 22 A.   No. |
| 23 Q.   How long have you lived in New York City? |
| 24 A.   Since 1989. |
| 25 Q.   Before that, and I'm not asking for the |

| Page 9 |
|---|
| 1        THOMAS JERMYN |
| 2        exact street address, but where did you |
| 3        live? |
| 4  A.   I lived in White Plains for three years |
| 5        prior to that when I was in the lawsuit.  I |
| 6        lived in South Carolina for four years prior |
| 7        to that in college and I grew up in Dutchess |
| 8        County, New York. |
| 9  Q.   Your date of birth? |
| 10 A.   12/27/62. |
| 11 Q.   Did you meet with your attorney to prepare |
| 12       for your deposition today? |
| 13 A.   Yes. |
| 14 Q.   By your attorney, I mean Mr. Braunstein who |
| 15       is sitting here next to you? |
| 16 A.   Yes. |
| 17 Q.   Anyone else present at that meeting? |
| 18 A.   No. |
| 19 Q.   When did you meet with him? |
| 20 A.   This morning.  We spoke by telephone and |
| 21       communicated by e-mail. |
| 22 Q.   Of course I'm not looking into the substance |
| 23       of those conversations, but how long did you |
| 24       meet with Mr. Braunstein this morning? |
| 25 A.   Fifteen minutes. |

3 (Pages 6 to 9)

THOMAS JERMYN,  MAY 2, 2008

Page 18

1           THOMAS JERMYN
2  Q.    With a firm?
3  A.    Sole practitioner.
4  Q.    Other than Mr. Plotkin, the other firm that
5        you spoke with or counsel at another firm
6        was Mr. Braunstein's firm?
7  A.    Yes.
8  Q.    When did you first decide that you wanted to
9        take legal action against Best Buy?
10 A.    When I was in the store. When I tried to
11       return the camera and see if they would
12       honor the Price Match Guarantee.
13 Q.    What was that date?
14 A.    May 13th, 2005 -- no, that's when I
15       purchased it. May 20th, 2005.
16 Q.    So these efforts that you've described to
17       seek out counsel, did you commence those
18       immediately after returning the camera on
19       May 20th?
20 A.    Yes.
21 Q.    So that -- (interrupted)
22 A.    Informally. I made a mental note. I said I
23       think I want to do something about this. I
24       even told them in the store. So I started
25       gathering information and things like that,

Page 20

1           THOMAS JERMYN
2        this firm?
3  A.    By telephone or in person?
4  Q.    We will start by telephone.
5  A.    Yes.
6  Q.    What was the date?
7  A.    Approximately April of '07.
8  Q.    Did you call them or did they call you?
9  A.    I called them.
10 Q.    Who did you speak with?
11 A.    Mr. Michael Braunstein.
12 Q.    When was the first time you met with anyone
13       at this firm in person?
14 A.    It was a few months later. About September
15       or October of '07.
16 Q.    At any time did you see any advertisements
17       or soliciting by Mr. Braunstein's firm for
18       this type of class action?
19 A.    No.
20 Q.    It was purely on your own volition that you
21       contacted Mr. Braunstein's firm?
22 A.    Yes.
23 Q.    Is the reason why you waited a few years
24       after the incident to file this lawsuit was
25       because you didn't have counsel to represent

Page 19

1           THOMAS JERMYN
2        going online, checking out blogs and seeing
3        if this was a potential case. Information
4        gathering.
5  Q.    You said you didn't engage counsel until
6        mid-2007; is that correct?
7     MR. BRAUNSTEIN:
8          Object to the form. I think the
9        testimony was mid-2007 was also six months
10       from today's date or approximately
11       thereabouts.
12    MS. DAUGHERTY:
13         You can object to misstating the
14       testimony.
15 Q.    Tell me what you did say?
16    MR. BRAUNSTEIN:
17         You can answer over my objection.
18 A.    Yeah, when I finally sat down with these
19       guys I realized they were a good firm and
20       they were -- I was going to give it to them
21       as soon as I met them.
22 MS. DAUGHERTY:
23 Q.    I'll reask my question. Do you remember the
24       first day you met with either Mr.
25       Braunstein, Mr. Graifman or anyone else with

Page 21

1           THOMAS JERMYN
2        you?
3  A.    I was looking around, but I travel a lot
4        with my business. I'm down in Florida a
5        lot, South Carolina, and I just got caught
6        up in things and I put it on the back
7        burner. It was waiting on my desk until I
8        finally decided to go forward. It was
9        something that was on my desk since 2005 and
10       I didn't want to put it away until I finally
11       met these guys in person. I knew the
12       statute of limitations was moving on it too.
13 Q.    You said you have businesses in Florida and
14       South Carolina?
15 A.    Yes.
16 Q.    What do you do?
17 A.    Real estate.
18 Q.    Do you fly there or drive there on a
19       periodic basis?
20 A.    Monthly basis.
21    MR. BRAUNSTEIN:
22         Wait for the question to be completed.
23 MS. DAUGHERTY:
24 Q.    Is it a regular practice of yours to travel
25       for your business?

6 (Pages 18 to 21)

THOMAS JERMYN,  MAY 2, 2008

| Page 34 | Page 36 |
|---|---|
| 1          THOMAS JERMYN | 1          THOMAS JERMYN |
| 2    you can answer. | 2    whether it's discretionary of whether they |
| 3 A.  Right.  Either like I said they bought | 3    will honor the price guarantee or not.  One |
| 4    something and then in the interim, the | 4    of them said that if it was $10 or $20 most |
| 5    statutory period, that they say on their | 5    of the time they would, but if it got over a |
| 6    either thirty days or fourteen in some | 6    certain limit like a hundred dollars they |
| 7    circumstances, if you find a competitor's | 7    wouldn't honor it.  That's what it said in |
| 8    price and bring it in there and they will | 8    one of the blogs.  One of them mentioned |
| 9    return it or lower the price with a 10 | 9    having a different website in the store. |
| 10    percent discount.  People that are shopping | 10    There were a lot of complaints against Best |
| 11    before they bought something and have an | 11    Buy, not all exactly like my case.  The only |
| 12    advertisement on the Best Buy website or | 12    ones I'm really concerned about are the ones |
| 13    something, a publication, and they see that | 13    similar to mine, people that bought |
| 14    you can bring an advertisement cheaper | 14    something and when they tried to return it |
| 15    before they buy it, will they honor it | 15    and get the guarantee pursuant to their |
| 16    there?  That's not exactly like mine, like | 16    Price Match Guarantee it wasn't honored. |
| 17    my case, but the first instance that I | 17 Q.  When you looked at these blogs, these people |
| 18    mentioned, the people that actually bought | 18    that wrote in, they described what the |
| 19    something are the ones more similar to my | 19    management told them when they tried to get |
| 20    case. | 20    the Price Match Guarantee? |
| 21 Q.  Sir, you would agree these websites you look | 21 A.  Sometimes.  Sometimes they would talk about |
| 22    at there's a variety of instances relating | 22    the attitude in the store, like the policy |
| 23    to people going in and trying to get -- | 23    of the store manager or the employees how |
| 24    (interrupted) | 24    they were treated.  Sometimes the facts |
| 25 A.  Either returns or -- sometimes having to do | 25    weren't the same as mine, but the treatment |

| Page 35 | Page 37 |
|---|---|
| 1          THOMAS JERMYN | 1          THOMAS JERMYN |
| 2    with gift cards or buying or anticipation of | 2    of the employees seemed the same.  There was |
| 3    purchasing to see if it will match before | 3    some connection between all of them in my |
| 4    some -- that some people try to do it | 4    case, but not all identical facts. |
| 5    beforehand, some people wait afterwards, and | 5 Q.  There was a variety of responses by |
| 6    the other ones were somewhat combined | 6    management or a variety of conversations |
| 7    between the gift cards and rebates and price | 7    that these people had with management or |
| 8    matching and refunds. | 8    Best Buy employees; right? |
| 9 Q.  So there were a variety of circumstances? | 9 A.  Yes. |
| 10 A.  Correct. | 10 Q.  They weren't all exactly the same as yours? |
| 11 Q.  When you looked at these blogs, did these | 11 A.  It wasn't so much of the response of the |
| 12    people, whomever was writing the blog, did | 12    Best Buy employees that they were getting |
| 13    they discuss representations that were made | 13    at, more of the result of what happened and |
| 14    in the store to them?  Do you want me to | 14    how it wasn't what they were advertising. |
| 15    clarify? | 15 Q.  So what you are looking at is when you read |
| 16 A.  Yes. | 16    these, what struck you in part was the |
| 17 Q.  Did they tell what the Best Buy people told | 17    result that these people related? |
| 18    them?  Did they relay what a manager or | 18 A.  Yes.  It was similar because the people were |
| 19    customer service representative told them? | 19    getting no satisfaction and in violation of |
| 20 A.  Some cases yes, some cases no. | 20    what appeared to be the written policy. |
| 21 Q.  There was -- was there a lot of discussion | 21 Q.  However, you would agree that these were a |
| 22    on these blogs, I guess the oral | 22    variety of circumstances, a variety of |
| 23    communications between the Best Buy workers | 23    stores; right? |
| 24    and them? | 24 A.  Yes. |
| 25 A.  Yeah.  It just seemed to me a pattern of | 25 Q.  And, in fact, we are not sure that all these |

10 (Pages 34 to 37)

THOMAS JERMYN,  MAY 2, 2008

| Page 38 | Page 40 |
|---|---|

**Page 38**

THOMAS JERMYN

2 people were trying to get the benefit of
3 Best Buy's Price Match Guarantee?
4 A. Right.
5 Q. Do you know who wrote these blogs?
6 A. No.
7 Q. Have you ever tried to contact anybody that
8 wrote these blogs?
9 A. No.
10 Q. Did you ever write a blog?
11 A. No.
12 Q. Ever write a comment to a blog?
13 A. No.
14 Q. With respect to these blogs, you simply just
15 read them?
16 A. Just read them.
17 Q. I want to go into the facts of what happened
18 in this case, sir. I understand that you
19 purchased a camera on May 13th, 2005; is
20 that correct?
21 A. Yes.
22 Q. Why don't you just start at the beginning
23 and tell me what happened?
24 A. I wanted to buy a Nikon D70 and one of the
25 reasons I chose Best Buy was because of the

**Page 40**

THOMAS JERMYN

2 buy it at Best Buy. So I made a printout of
3 the advertisement from Tristate, their
4 competitor, took it there and then they
5 informed me that they wouldn't honor the
6 guarantee, they wouldn't reduce the price
7 and they would charge me the restocking fee
8 if I tried to return it. I figure outside
9 the price with the restocking fee from the
10 other camera place was still 860 plus
11 180, it came out to 1,040 as opposed to
12 1,199 minus a hundred or 1,099. It was
13 still $50 or less with paying the restocking
14 fee. They railroaded me out of the store
15 and I tried to get information from them
16 saying what is it about this case that
17 doesn't fit your guarantee and they wouldn't
18 give me an answer. Nobody could give me a
19 square answer, so I mentioned that I was an
20 attorney and I was going to pursue this case
21 and they said fine, go ahead. They didn't
22 seem to be worried about that. It almost
23 looked like they had dealt with this
24 situation many times the way they handled
25 it. Like I said, it was very robotic and

**Page 39**

THOMAS JERMYN

2 Price Match Guarantee. There was a store
3 near to where I lived and I went in there
4 and bought the camera knowing that they --
5 knowing the Price Match Guarantee. I
6 figured I would look around in the next
7 thirty days or fourteen days and see if
8 anybody has it for less, the D70, in the
9 meantime. I asked them before I bought it,
10 they said no problem. I wasn't aware of
11 anybody that had any problems at Best Buy
12 prior to that. So a week later walking near
13 the store, because I worked in that area and
14 walked by it a lot, I happened to walk by
15 Tristate Camera which is about three blocks
16 away from the Best Buy store and saw the
17 camera and asked them how much it was. I
18 thought it was 959 before the hundred dollar
19 rebate. It was May 20th, so it was within
20 the statutory period on the Best Buy
21 guarantee. There were no restrictions or no
22 fine print because of the type of material.
23 They limited it from thirty to fourteen
24 days, so I was still within that. I brought
25 the camera back to Best Buy fully wanting to

**Page 41**

THOMAS JERMYN

2 there was no listening to what I had to say.
3 I would have gladly given the business to
4 Best Buy had they lowered the price. I
5 tried to reason with the manager of the
6 store saying I'm a good customer, I bought
7 many things here, why not reward someone who
8 is a loyal customer rather than lose a
9 customer and they didn't care what I said.
10 They just kind of wanted me out of the store
11 before I made a scene. I returned the
12 camera, bought it at Tristate, paid the
13 restocking fee, it was still $49 less and
14 then I started searching around for my --
15 looking at my legal remedies. A year and a
16 half later I found Graifman's office.
17 Q. I believe you said it was $59 less at one
18 point and now you just said $49 less.
19 A. It was 859 after the rebate from Tristate
20 and it was 1,099 after the rebate from Best
21 Buy. 859 plus 180 for the restocking fee
22 came out to be 1,059. So it was still
23 cheaper.
24 Q. Let's back up here. On May 13th, did you
25 have --

11 (Pages 38 to 41)

THOMAS JERMYN, MAY 2, 2008

Page 46

1         THOMAS JERMYN
2    B&H. I may have looked at it once or twice
3    to see what kind of features it had on it.
4    I didn't check the price or anything like
5    that.
6    MR. BRAUNSTEIN:
7         I don't want you to guess. You were
8    saying you may have done that. If you think
9    you did it or you are pretty sure you did
10   it, just tell us in those words. Neither of
11   us want you to guess at those answers.
12 A.   I don't recall.
13 MS. DAUGHERTY:
14 Q.   That's fine. As your attorney said, I'm not
15   asking for you to speculate at all. To the
16   best of your recollection what you did,
17   that's what I want to know.
18 A.   Okay.
19 Q.   So you believe that you had looked at a
20   couple different stores including B&H and
21   Circuit City?
22 A.   Uh-huh.
23 Q.   Yes?
24 A.   Yes.
25 Q.   Would you say this was in May 2005 as well,

Page 47

1         THOMAS JERMYN
2    but before May 13th?
3 A.   April, maybe March. If I recall correctly,
4    the camera was kind of new at that time.
5    The D70 wasn't out that long.
6 Q.   Did you ever have any intention of
7    purchasing the camera at either B&H or
8    Circuit City?
9 A.   I had never bought any camera equipment
10   anyplace else in the city except Ken Hansen.
11   My original intention was to buy it there.
12   I had developed a relationship with Ken
13   Hansen himself and salespeople, but for some
14   reason either he wasn't in business at that
15   time or he was -- I know he moved to Florida
16   and came back. One reason or another I
17   didn't buy it at Ken Hansen.
18 Q.   How do you spell that?
19 A.   Ken H-A-N-S-E-N.
20 Q.   Does he have a store right now?
21 A.   I'm not even sure. He's known locally as
22   one of the best photo places where you could
23   get used gear and a professional shop at his
24   store.
25 Q.   I believe you stated one or the main reasons

Page 48

1         THOMAS JERMYN
2    that you decided to go to Best Buy to
3    purchase this camera on May 13th was because
4    you thought they had a reputation for the
5    best prices?
6 A.   Yes.
7 Q.   Is that in a nutshell what you said?
8 A.   Yes.
9 Q.   Is there any other reason why you went to
10   Best Buy on May 13th to buy this camera?
11 A.   Just because it was convenient.
12 Q.   At that time did you know about Best Buy's
13   Price Match Guarantee?
14 A.   Yes.
15 Q.   Was that another reason you went to Best
16   Buy?
17 A.   Yes.
18 Q.   When you went to Best Buy to purchase this
19   camera, did you have the specific intention
20   of buying the camera and looking around and
21   then perhaps trying to get the benefit of
22   the guarantee?
23 A.   Looking back on it, yes.
24 MR. BRAUNSTEIN:
25        Just in general, wait for her to

Page 49

1         THOMAS JERMYN
2    finish the question. You may know what the
3    question is or is going to be, but it's much
4    easier for the court reporter. Let her
5    finish the question before you answer.
6 A.   Yes, because I had inquired when I bought
7    the camera specifically whether -- what the
8    policy was, just in case. I didn't really
9    do too much research when it came to price,
10   but then I just figured this is a good
11   policy as far as the Price Match Guarantee
12   even after, so I figured if I'm going to do
13   it I better do it quick, like in the first
14   week, so I don't have to have this issue,
15   this thing that's excluded because on their
16   form it says some items have a fourteen-day
17   limit. Generally most items are thirty-day,
18   but just to be safe I said if I'm going to
19   find something I better do it quick so I
20   won't have to worry about them --
21   (interrupted)
22 Q.   You did or did not know about the Price
23   Match Guarantee before May 13th, 2005?
24 A.   I did know about the price guarantee.
25 Q.   That was a factor in your decision to go to

13 (Pages 46 to 49)

THOMAS JERMYN,  MAY 2, 2008

|  | Page 54 |
|---|---|

THOMAS JERMYN

1
2  when I was buying the camera, but when I
3  came back that's when their attitude
4  changed.
5 Q.  My question was, what did the employee say
6  to you or what was the communication when
7  you got to the camera shop area? Let's
8  start with this, it would be easier with the
9  question I asked you. You go over to the
10  camera area -- (interrupted)
11 A.  Do you have the D70 in stock?
12 Q.  That's all you asked them?
13 A.  Yes. They said yes, we do.
14 Q.  You said something like let me take a look
15  at it?
16 A.  I didn't even open it. It's all shrink
17  wrapped and everything. They had it in
18  stock and I took it. Before I took it I
19  wanted to make sure what the policy was as
20  far as returning it.
21 Q.  Okay.
22 A.  I figured I might see these people within
23  the next thirty days. I think if I
24  mentioned it beforehand they would remember
25  me if I did come back. They assured me

|  | Page 55 |
|---|---|

THOMAS JERMYN

1
2  quickly that there would be no problem if it
3  was within the thirty days.
4 Q.  So I appreciate the fact that you have a lot
5  of camera experience and therefore you did
6  not ask any questions specifically about the
7  camera; correct?
8 A.  I may have, but I quickly realized they
9  didn't know what they were talking about.
10  You don't go into a store like that looking
11  for finer points of cameras or things like
12  that. I've known that from past experience.
13  Maybe TVs or stereos, but when it comes to
14  cameras, maybe the low end they may
15  understand better, but when it comes to the
16  high end, it's technical things. Unless you
17  are a photographer you are not going to know
18  that unless you use the camera every day.
19  The features on the camera are pretty
20  technical.
21 Q.  You went up to the counter, they said yes,
22  we have the camera in stock, they gave it to
23  you, you maybe would have asked questions
24  about the features?
25 A.  And the rebate.

|  | Page 56 |
|---|---|

THOMAS JERMYN

1
2 Q.  How about the features, did you ask any
3  questions?
4 A.  No. You can tell whether it's worth your
5  time or not if they know what they are
6  talking about. I knew what I was getting
7  and they weren't going to help me or
8  persuade me any more than what I already
9  knew.
10 Q.  You said you never took the camera out of
11  the box when you were at the store?
12 A.  No.
13 Q.  Did you look at the display model?
14 A.  Yeah. They have it chained with the lock on
15  it. You can pick it up. You can't use it,
16  it's not -- the battery is not charged and
17  there's no card in there. You can feel how
18  it feels in your hand, look through it.
19 Q.  In addition to the substantive questions, if
20  any, that you may have asked about the
21  camera, you said you asked about a rebate
22  did you say?
23 A.  Yes.
24 Q.  Tell me about this rebate?
25 A.  Nikon had a hundred dollar rebate on the

|  | Page 57 |
|---|---|

THOMAS JERMYN

1
2  camera. I wanted to make sure I got the
3  right receipt and how soon I had to send it
4  in. They printed me up a receipt.
5 Q.  Where did they print up the rebate receipt?
6 A.  At the Best Buy.
7 Q.  Is that when you purchased the camera, going
8  through the checkout line?
9 A.  Yes. It all comes out at the same time.
10 Q.  When you spoke with the person, we will call
11  that person the camera salesman, the person
12  that sold you the camera itself, not the
13  other person -- they were two different
14  people?
15 A.  Yes. Well, I don't recall to tell you the
16  truth. I don't know whether the person
17  followed me up to the register or you go to
18  the front. I'm not sure whether it was the
19  same person or not.
20 Q.  Fair enough. We will say the camera
21  salesman who I'm referring to as the
22  salesman that got the camera out of the
23  glass case for you. In addition to asking
24  about the rebate, did you ask that person
25  about the Price Match Guarantee?

15 (Pages 54 to 57)

THOMAS JERMYN,  MAY 2, 2008

Page 62

| | THOMAS JERMYN |
|---|---|
| 1 | THOMAS JERMYN |
| 2 | Store on West Canal Street. There's a lot |
| 3 | of retail electronic dealers in New York |
| 4 | that advertise low prices, you can get a |
| 5 | great market camera, no warranty. Just |
| 6 | assuming by going to Best Buy you are going |
| 7 | to get the best price or something better. |
| 8 | MS. DAUGHERTY: |
| 9 | Read back the question. |
| 10 | |
| 11 | (QUESTION REPEATED BY REPORTER) |
| 12 | |
| 13 A. | Which person? |
| 14 | MR. BRAUNSTEIN: |
| 15 | Just for context, correct me if you |
| 16 | think I'm wrong, we are talking about at the |
| 17 | checkout line and talking about the Price |
| 18 | Match Guarantee? |
| 19 | MS. DAUGHERTY: |
| 20 | That's correct. |
| 21 Q. | What did you say to that person? |
| 22 A. | Will you honor the Price Match Guarantee? |
| 23 | Is there anything I should know about this |
| 24 | that is not shown on the front of this page. |
| 25 | I remember seeing an asterisks on there |

Page 64

| | THOMAS JERMYN |
|---|---|
| 1 | THOMAS JERMYN |
| 2 | like? |
| 3 A. | No. |
| 4 Q. | Do you remember how old this person was? |
| 5 A. | I just remember kind of thinking like high |
| 6 | school age woman, black. |
| 7 Q. | Black woman? |
| 8 A. | Yes. |
| 9 Q. | High school age? |
| 10 A. | Yes. |
| 11 Q. | Okay. |
| 12 A. | Nineteen, twenty, twenty-one. |
| 13 Q. | So you are fairly certain neither of these |
| 14 | people that we discussed so far were |
| 15 | management level? |
| 16 A. | Yes, I'm pretty certain. Nobody made a big |
| 17 | impression on me. I can't say whether it |
| 18 | was the same people when I went back. It |
| 19 | wasn't like -- (interrupted) |
| 20 | MR. BRAUNSTEIN: |
| 21 | We will get to that. |
| 22 | MS. DAUGHERTY: |
| 23 Q. | You said that you saw on the front of the |
| 24 | page something about the Price Match |
| 25 | Guarantee. Do you remember saying that a |

Page 63

| | THOMAS JERMYN |
|---|---|
| 1 | THOMAS JERMYN |
| 2 | about the days. They said don't worry about |
| 3 | it, as long as it's within thirty days. I |
| 4 | just assumed the asterisks mentioned |
| 5 | something. I made a mental note at the |
| 6 | time, make sure if you do something it's |
| 7 | within fourteen days to avoid any problem |
| 8 | down the road. |
| 9 Q. | This person that you actually physically |
| 10 | purchased a camera from in the checkout |
| 11 | line, was that a store clerk, manager, |
| 12 | assistant manager? |
| 13 A. | They are all store clerks. No manager until |
| 14 | the second time I went in. |
| 15 Q. | Was that a male or female? |
| 16 A. | I think it was female, the person at the |
| 17 | checkout counter and a male that said you |
| 18 | want this camera. |
| 19 Q. | So the first person in the camera area was a |
| 20 | male? |
| 21 A. | Yes. |
| 22 Q. | Second person was a female when you actually |
| 23 | paid with your credit card? |
| 24 A. | Yes. American Express. |
| 25 Q. | Do you remember what this person looked |

Page 65

| | THOMAS JERMYN |
|---|---|
| 1 | THOMAS JERMYN |
| 2 | minute ago? |
| 3 A. | Yeah. There was like some asterisks on |
| 4 | there and thinking there has to be some fine |
| 5 | print on the back, something on the bottom. |
| 6 | It says the time period was the main thing I |
| 7 | was worried about, thirty days. There's |
| 8 | like an asterisks that says fourteen days on |
| 9 | some items. It doesn't specify what they |
| 10 | are, so I was thinking in that case if it's |
| 11 | vague I'm going to assume that they mean |
| 12 | cameras, so that's basically what I meant. |
| 13 Q. | We have it on the record about everything |
| 14 | you talked about with regard to the |
| 15 | asterisks, I'll ask you about that later if |
| 16 | I want to know more specifically about that. |
| 17 | When you say the front of the page, are you |
| 18 | referring to the Price Match Policy? |
| 19 A. | Yes. The reason I said the front of the |
| 20 | page was it was actually translated on the |
| 21 | back. Spanish on the back, English on the |
| 22 | front. I remember looking on it and saying |
| 23 | maybe the back was fine print or conditions |
| 24 | for the front, but it was just the same |
| 25 | thing in Spanish. |

17 (Pages 62 to 65)

THOMAS JERMYN, MAY 2, 2008

| Page 74 | Page 76 |
|---|---|

**Page 74**

1 THOMAS JERMYN
2 MS. DAUGHERTY:
3     For the record as well, this was asked
4 for in our document requests specifically.
5 Best Buy is entitled to this document and
6 the photocopy of the backside.
7
8     (REQUESTED INFORMATION HERE)
9
10 MR. BRAUNSTEIN:
11     Okay.
12 MS. DAUGHERTY:
13     We won't be following up in writing,
14 you can take a look at that, it's in the
15 document request.
16 Q.    Now we are talking to the salesgirl, you are
17 at the checkout counter.  What did you say
18 to her about the Price Match Policy, if
19 anything?
20 A.    I think I was -- I think I had discussed it
21 with the salesman and the salesperson just
22 ran my credit card.
23 Q.    Maybe this could be my inaccuracy.  I
24 thought you weren't sure or you didn't think
25 you spoke to the camera salesperson about

**Page 75**

1 THOMAS JERMYN
2 it, but you may have.
3 A.    I'm not sure whether it was him or the woman
4 who -- I remember talking to them and just
5 making sure it was -- I had the right to
6 bring it back and bring in a competitor's ad
7 or whatever.
8 Q.    You don't recall whether it was the camera
9 salesperson or the checkout woman?
10 A.    No.  I'm not sure if it was one person who
11 did both or if I'm getting it confused at
12 other times with other stores.  I don't
13 remember what the store was like at that
14 time as opposed to the next time I went.
15 Q.    It's true when you discussed the Price Match
16 Policy with somebody on May 13th, 2005 it
17 was with a store clerk, not a store manager?
18 A.    Yes.
19 Q.    It's true you do specifically remember
20 discussing the Price Match Policy in some
21 form with someone at the store on May 13th?
22 A.    Yes.
23 Q.    I know you said you asked about the policy.
24 Specifically can you tell me anything else
25 that you asked?

**Page 76**

1 THOMAS JERMYN
2 A.    No.  Like I told you before, I was used to
3 buying cameras -- (interrupted)
4 MR. BRAUNSTEIN:
5     Listen to the question and answer the
6 question.
7 A.    Where I could bring them back, so I just
8 wanted to make sure a quick conversation
9 whether I could bring it back.
10 MS. DAUGHERTY:
11 Q.    You said can I bring it back?
12 A.    Yes.
13 Q.    You weren't asking in the context of just to
14 return it, you were asking could you bring
15 it back to get the benefit of the Price
16 Match Guarantee?
17 A.    Yes.
18 Q.    Did you make that clear when you said that
19 to the person in the checkout line?
20 A.    I don't recall.
21 Q.    So it's possible that that person could have
22 thought you were maybe talking about a
23 return policy?
24 MR. BRAUNSTEIN:
25     Objection to the form.  You can answer

**Page 77**

1 THOMAS JERMYN
2 over objection.
3 A.    It could, yes.
4 MS. DAUGHERTY:
5 Q.    Or that person could think that in asking if
6 you would bring it back you were talking
7 about bringing it back for a number of other
8 Best Buy policies?
9 MR. BRAUNSTEIN:
10     Objection to the reason you are
11 speculating what the other person would
12 think, but you can answer.
13 A.    I don't understand the question.
14 MS. DAUGHERTY:
15 Q.    The other person could think when you --
16 when you ask could I bring it back, it could
17 be for a number of reasons; right?
18 MR. BRAUNSTEIN:
19     Same objection.  You can answer.
20 A.    Sure.
21 MS. DAUGHERTY:
22 Q.    Not necessarily the Price Match Guarantee?
23 A.    Right.  I could bring it back for any
24 reason, if I didn't like it, if it didn't
25 work well, that I could return it for any

20 (Pages 74 to 77)

THOMAS JERMYN,  MAY 2, 2008

Page 82

THOMAS JERMYN

1 THOMAS JERMYN
2 salesman.  They go to the clinics that the
3 camera companies put on.  You are better off
4 buying it at a place like that than at a
5 commodities place.  You get better service.
6 Sometimes there's problems.  That's why I
7 bought all my equipment at Ken Hansen
8 before.  They will buy back the equipment
9 too.
10 Q.    At the time when you went into Best Buy on
11 May 13th, 2005, did you have the intent to
12 specifically go to Tristate to try to find
13 the same camera?
14 A.    No.  I would have gone anywhere.
15 Q.    But you did have the intent to shop around?
16 A.    Yes.
17 Q.    At that point you didn't know that I'm going
18 to Tristate next?
19 A.    Yes.
20 Q.    Had you ever been into Tristate before
21 purchasing -- (interrupted)
22 A.    Yes.
23 Q.    -- the camera?
24 A.    Yes.
25 Q.    Tell me after you left Best Buy, where did

Page 83

THOMAS JERMYN

1 THOMAS JERMYN
2 you shop around?
3 A.    Probably online.  May have looked in a store
4 or two.
5 Q.    What stores do you think you looked in?
6 A.    Probably B&H would be the first one and
7 maybe looked online.  I think I looked in
8 the back of Peterson's Photography.  Some of
9 the magazines have camera distributors
10 and/or advertisements in the back.
11 Q.    This was between the date of your purchase,
12 May 13th, and the date of the return, May
13 20th?
14 A.    Yes.
15 Q.    Showing you what has been marked as
16 Defendant's Exhibit B.
17     (Document submitted)
18 A.    Okay.
19 Q.    Have you had a chance to look at it?
20 A.    Yes.
21 Q.    What is that document?
22 A.    This was the printout from a computer ad
23 that Tristate Cameras had at the time I
24 purchased, that I took a copy of this over
25 to Best Buy.

Page 84

THOMAS JERMYN

1 THOMAS JERMYN
2 Q.    If you look in the lower right-hand corner,
3 it looks like a date is imprinted on here
4 5/19/05.  Do you see that?
5 A.    Yes.  It's also on the top left too.
6 Q.    To the best of your recollection, was the
7 first time that you saw this advertisement
8 online May 19th, 2005?
9 A.    I'm not sure, because that might have been
10 the day I printed it.  I'm not sure if I got
11 it May 14th, May 13th.  I'm not exactly
12 sure.  This was when I printed it and I
13 printed it so I could take it to the store.
14 Q.    In any event, you printed it on May 19th,
15 2005?
16 A.    Yes.
17 Q.    You look at the bottom right-hand corner, it
18 looks like the time that you printed it off
19 was cut off.  Do you see that?
20 A.    Uh-huh.
21 Q.    Yes?
22 A.    Yes.
23 Q.    Looks to me like the first number could be a
24 4.  Do you have any idea what the first
25 number is or when you printed it off would

Page 85

THOMAS JERMYN

1 THOMAS JERMYN
2 be a fairer question?
3 A.    4:30 in the afternoon.
4 Q.    Now, had you ever been into the Tristate
5 store before May 19th, 2005?
6 A.    Yes.
7 Q.    When had you first gone into Tristate?
8 A.    Maybe five years earlier.  They are a
9 well-known store.
10 Q.    In New York?
11 A.    Yes.
12 Q.    You maybe went in five years earlier for an
13 unrelated reason?
14 A.    Yes.  It's the kind of store that you are
15 walking around and you may want to go in and
16 see if they have a good deal on lenses or
17 bags or whatever.  They are a reputable
18 store.
19 Q.    At the time you printed out this
20 advertisement on May 19th, 2005, had you
21 been in the Tristate store within the prior
22 three weeks?
23 A.    No, I don't think so, because I really would
24 have looked and gotten the price on this.
25 It was only by mistake thinking that Best

22 (Pages 82 to 85)

THOMAS JERMYN,  MAY 2, 2008

Page 86

1        THOMAS JERMYN
2   Buy was selling it -- (interrupted)
3   MR. BRAUNSTEIN:
4       Listen to the question and answer the
5   question.
6 A.    No, I hadn't. I would have otherwise never
7   gone to Best Buy.
8 MS. DAUGHERTY:
9 Q.    After you purchased the camera on May 13th,
10   you had not been inside the Tristate store
11   before you printed it up? This I mean
12   Exhibit B.
13   MR. BRAUNSTEIN:
14       I'm not sure I understand the
15   question. Read it back.
16
17       (QUESTION REPEATED BY REPORTER)
18
19 MS. DAUGHERTY:
20 Q.    There's no objection on the record, so did
21   you understand my question?
22 A.    Yes.
23 Q.    Your answer was?
24 A.    No.
25 Q.    When you found this advertisement, you

Page 87

1        THOMAS JERMYN
2   printed it out; right?
3 A.    Yes.
4 Q.    And you went back to Best Buy the next day;
5   is that right?
6 A.    Yes.
7 Q.    May 20th?
8 A.    Yes.
9 Q.    You went to Best Buy before you actually
10   went into the Tristate store; right?
11 A.    Yes.
12 Q.    Did you ever go into the Tristate store
13   before returning the camera at Best Buy to
14   see if the Tristate store would honor this
15   ad?
16 A.    Of course. You're asking between whether
17   the 13th and 20th I went into Tristate to
18   find out what the price was? Yeah, I did.
19   I found out that the price was this
20   because -- I went in the store first and
21   then I may have gone in there on like the
22   17th or 16th and then realized I had to get
23   something in writing because, you know, they
24   wanted this at Best Buy. I printed it up
25   and in. I wanted to find out what the

Page 88

1        THOMAS JERMYN
2   price was and find out what their price was.
3 Q.    I think your testimony is a little
4   inconsistent. It could be just bad
5   questions. Just to clear everything up,
6   from the time you purchased the camera at
7   Best Buy on May 13th, 2005, when was the
8   first time you went into Tristate?
9 A.    I thought you were talking about prior to
10   May 13th.
11 Q.    That's all right.
12 A.    The first time may have been -- I'm not
13   exactly sure of the dates, but probably two
14   or three days afterwards.
15 Q.    You went into Tristate -- (interrupted)
16 A.    I knew the clock was running --
17   (interrupted)
18 Q.    Let me finish the question. I just want you
19   to answer the questions that I ask. At the
20   time --
21   MS. DAUGHERTY:
22       Strike that.
23 Q.    You purchased the Best Buy camera on May
24   13th. You went to Tristate between that
25   time and May 19th when you printed this out;

Page 89

1        THOMAS JERMYN
2   is that correct?
3 A.    Yes.
4 Q.    You went into Tristate for the purpose of
5   seeing if they had the same camera at a
6   lower price?
7 A.    Yes.
8 Q.    At some time after you went into the
9   Tristate store you printed this online?
10 A.    Yes.
11 Q.    And is this the exact same price that was
12   offered in the store, the Tristate store?
13 A.    Yes.
14 Q.    When you were in Tristate, between May 13th
15   and May 19th, did you specifically ask
16   Tristate if they had a website that offered
17   the same prices?
18 A.    No. I went in there shopping for the price
19   and then I got a quote from the guy and then
20   I said let me make sure you have that -- no.
21   I think I might have gone back to Best Buy
22   and they said you have to have it in writing
23   or just print it up, if it's not in a
24   publication that's mailed out or given out,
25   print up the page on their website that

23 (Pages 86 to 89)

THOMAS JERMYN,  MAY 2, 2008

Page 90

1          THOMAS JERMYN
2   shows what you are telling me and then I did
3   and then they still wouldn't honor it.
4 Q.   Okay.
5 A.   When I went in there on the 20th.
6   MR. BRAUNSTEIN:
7        Listen to the questions and answer the
8   questions.
9 MS. DAUGHERTY:
10 Q.   When did you go into Best Buy next after May
11   13th, 2005?
12 A.   Probably on the 18th or maybe on the 19th.
13 Q.   Let's say you went in on the 18th or 19th.
14   You had already been in the Tristate store?
15 A.   Yes.
16 Q.   You saw that they offered the same camera at
17   a different price?
18 A.   Yes.
19 Q.   At the time you went into Best Buy on May
20   18th or 19th it's true you had not yet
21   printed this off online?
22 A.   Yes.
23 Q.   You went into Best Buy.  What did you do?
24 A.   I said your guarantee says that you will
25   honor lower prices or match lower prices

Page 91

1          THOMAS JERMYN
2   with the 10 percent -- and add 10 percent
3   onto the lowest price -- I mean 10 percent
4   discount to the lowest price.  Here is what
5   I got at Tristate Cameras -- no, around the
6   corner they have it for less.  They said you
7   have to get something in writing.  I think I
8   went back and got it in writing and had to
9   go back again.
10 Q.   Who did you talk to when you went into the
11   Best Buy store on May 18th or 19th?
12 A.   It wasn't the manager.  I remember seeing
13   the manager one time only, so it was just
14   somebody at customer service.
15 Q.   Did you go straight to the customer service
16   desk?
17 A.   I think so.
18 Q.   You walked into the Best Buy on the 18th or
19   19th and went to the customer service desk;
20   right?
21 A.   Yes.
22 Q.   You said I purchased a camera here the other
23   day, around the corner at Tristate they have
24   a lower price?
25 A.   Yes.

Page 92

1          THOMAS JERMYN
2 Q.   He or she, do you remember?
3 A.   I think it was a lady.  She said bring it in
4   in writing.
5 Q.   You are sure this lady at the customer
6   service desk was not a manager?
7 A.   I'm not sure.
8 Q.   In any event -- (interrupted)
9 A.   I don't know how many managers they have.
10   On the 20th when someone came out it was a
11   man when I asked to see a manager.
12 Q.   In any event, on the 18th or 19th you did
13   not ask to see a manager?
14 A.   No.
15 Q.   You spoke with the person that was at the
16   customer service desk?
17 A.   Yes.
18 Q.   She said you need to get something in
19   writing to show what the price is at
20   Tristate?
21 A.   Yes.
22 Q.   You left the store?
23 A.   Yes.
24 Q.   And then you went to your home; is that
25   right, and printed this out?

Page 93

1          THOMAS JERMYN
2 A.   Yes.
3 Q.   When I'm talking about this, I mean Exhibit
4   B, the Tristate advertisement?
5 A.   Yes.
6 Q.   Did you go to Tristate again between Best
7   Buy on May 18th or 19th and when you
8   actually purchased a Tristate Camera?
9 A.   No.
10 Q.   Just to be clear, when you went into
11   Tristate before May 18th or 19th, but after
12   you purchased the Best Buy camera, did you
13   specifically ask Tristate if they had the
14   same prices online that they had in this
15   brick and mortar store or did you not know?
16 A.   I don't know.  I don't recall.
17 Q.   You don't specifically remember asking them
18   if I go on your website will you have the
19   same prices?
20 A.   I think I did.  I remember the guy I spoke
21   about, I remember the salesperson there, he
22   said yeah, you know, we have the same
23   prices.
24 Q.   I don't want you to guess.  If you don't
25   recall, that's fine.

24 (Pages 90 to 93)

THOMAS JERMYN,  MAY 2, 2008

Page 94

THOMAS JERMYN
1
2  A.   I do recall.  I said give me your flier or
3       something.
4  Q.   So then after May 18th or 19th you went in,
5       printed this off, which is Exhibit B, and
6       then your first step was to go back to Best
7       Buy or to go to Tristate?
8  A.   Back to Best Buy.
9  Q.   You went back on May 20th?
10 A.   Yes.
11 Q.   You walked in the store?
12 A.   Yes.
13 Q.   You had your camera in your bag?
14 A.   All the original packaging, receipts, bags
15      and everything and this in my hand
16      (indicating).
17 Q.   Did you open the camera box?
18 A.   Yes.
19 Q.   Did you get the camera out?
20 A.   Yes.
21 Q.   Did you -- (interrupted)
22 A.   I used the camera.
23 Q.   You used the camera?
24 A.   Yes.  It worked fine.
25 Q.   The camera worked fine?

Page 95

THOMAS JERMYN
1
2  A.   Yes.  It worked fine, there was nothing
3       wrong with it.
4  Q.   There was nothing defective?
5  A.   No.
6  Q.   You went back into Best Buy?
7  A.   And then I tried to show them what was going
8       on.  I figured it was quick in, quick out.
9       I wanted to keep the camera.  Just honor
10      this price, check my receipt, honor that
11      price.  I don't care about the extra 10
12      percent.  Do what you say you are going to
13      do.  Then they said -- then the stonewalling
14      process started.  I started detecting a
15      little change in their demeanor.
16 Q.   I'll ask you about that.  Let's go back.
17      You went in the Best Buy store with the
18      camera in the bag.  Did you go over to the
19      customer service desk right away?
20 A.   Right away.  That's when I noticed something
21      was funny.
22      MR. BRAUNSTEIN:
23           Listen to the question.
24 MS. DAUGHERTY:
25 Q.   Sir, I know that you know what I'm -- what

Page 96

THOMAS JERMYN
1
2       questions I'm going to ask, but just answer
3       the question that I ask.  You went straight
4       to the customer service desk?
5  A.   Yes.
6  Q.   Who was working back there?
7  A.   There were a few people standing there, but
8       right away they just told me no, we are not
9       taking that back.  I asked them -- I started
10      having a discussion with them.
11 Q.   Now, you are anticipating my question again.
12      All I want to know is do you remember who
13      the person was that was working that day,
14      yes or no?
15 A.   No.
16 Q.   Was it the same person that was working on
17      May 18th or 19th?
18 A.   I don't recall.
19 Q.   In fact, you did speak to somebody then,
20      that one person behind the customer service
21      desk?
22 A.   Yes.
23 Q.   Do you recall whether or not this was a male
24      or female?
25 A.   Female.

Page 97

THOMAS JERMYN
1
2  Q.   Do you know how old she was?
3  A.   Early 20s.
4  Q.   Do you know whether or not she was a
5       manager?
6  A.   She wasn't.
7  Q.   I just want to know, what did you say to
8       this person?
9  A.   I want to return this or I want to see if
10      you will honor the Price Match Guarantee.
11 Q.   And you had a copy of Exhibit B in your
12      hand?
13 A.   Yes.  And the receipt and the camera.
14 Q.   What was the first thing she said to you?
15 A.   We can't honor this.  We can't take this
16      back.
17 Q.   Why?
18 A.   She didn't give me a reason.  I said give me
19      a reason.  Where -- I think I had a copy of
20      the Best Buy Price Match Guarantee in my
21      hand.  I'm pointing to it asking where on it
22      does it say, show me where.  After awhile
23      they said -- (interrupted)
24      MR. BRAUNSTEIN:
25           Just talk about this conversation, one

25 (Pages 94 to 97)

THOMAS JERMYN,  MAY 2, 2008

| Page 98 |
|---|

```
1              THOMAS JERMYN
2     thing at a time.
3  MS. DAUGHERTY:
4  Q.    So you said you had a copy of the Price
5     Match Policy in your hand and you said you
6     want the benefit of the Price Match
7     Guarantee?
8  A.   Yes.
9  Q.   Where did you get a copy of the Price Match
10    Policy?
11 A.   It was what I had, like I said, I picked it
12    up from the store. I think it was in
13    Dutchess County.
14 Q.   So the copy that you had at home?
15 A.   Yes.
16 Q.   She said no and she didn't give you a reason
17    why initially?
18 A.   Right.
19 Q.   You asked for an explanation?
20 A.   Yes.
21 Q.   What did she say?
22 A.   I said show me on this form where the
23    exception is that you are not taking your
24    back. I don't see it. I'm fulfilling all
25    the conditions, it's been fourteen days
```

| Page 99 |
|---|

```
1              THOMAS JERMYN
2     and -- (interrupted)
3  MR. BRAUNSTEIN:
4       The question was what she said.
5  A.   She said no.
6  MR. BRAUNSTEIN:
7       Was that the question?
8  MS. DAUGHERTY:
9       Yes.
10 A.   I asked her -- she asked about the form.
11 Q.   What did she say to you? What was the
12    reason given?
13 A.   No reason. That's why I was getting angry,
14    she wasn't giving me a reason.
15 Q.   You showed her the form, you said show me on
16    this form -- (interrupted)
17 A.   What your reasons are why you won't accept
18    this return, Price Match. I don't want a
19    return, I wanted the Price Match.
20 Q.   What did she say?
21 A.   She said we can't match the competitor's
22    price.
23 Q.   And she didn't give you any reason
24    whatsoever?
25 A.   No.
```

| Page 100 |
|---|

```
1              THOMAS JERMYN
2  Q.   You said get a manager?
3  A.   Yes.
4  Q.   What did the manager say?
5  A.   He categorically denied it, backing her up.
6     I think I got angry -- (interrupted)
7  MR. BRAUNSTEIN:
8       Just what he said.
9  A.   He said no. I answered back why? Look on
10    the form. You should honor this. He kept
11    saying no. He just kept saying no.
12 MS. DAUGHERTY:
13 Q.   The manager comes over to you. You say here
14    is everything. Here is the camera, the
15    receipt, the advertisement, match this price
16    and he said to you we can't?
17 A.   Correct. That's all he said.
18 Q.   You asked for an explanation?
19 A.   Only like the only thing he could tell me
20    was we only match major chains.
21 Q.   That's what he told you?
22 A.   I said where does it say major chains in
23    here? That to me was an admission of guilt
24    right there. As soon as he said that, I
25    said fine, okay, major change, I don't see
```

| Page 101 |
|---|

```
1              THOMAS JERMYN
2     anything in writing in there, unless you can
3     show me an asterisks or some fine print.
4     Right away I knew I had a good case as soon
5     as he said that.
6  MR. BRAUNSTEIN:
7       Talk about what he said.
8  A.   He just said major chains. I said I don't
9     see major chains in here, show me.
10 MS. DAUGHERTY:
11 Q.   The only reason that the manager gave you
12    for not matching the price is the fact Best
13    Buy only matched major chains?
14 A.   Yes.
15 Q.   That's the only thing?
16 A.   That's all he said.
17 Q.   After he said that, what did you do?
18 A.   I said okay, charge me the restocking fee,
19    I'll buy it over there, you will see me
20    in court, I'm an attorney and they said, oh,
21    we don't care.
22 Q.   Anything else they said?
23 A.   Then they just got nasty with me. Fine,
24    didn't even offer me any kind of
25    consideration, they just wanted me out of
```

26 (Pages 98 to 101)

THOMAS JERMYN,  MAY 2, 2008

| Page 102 | Page 104 |
|---|---|
| 1          THOMAS JERMYN<br>2    the store.  It was like the voices were<br>3    getting raised.  It was almost like they<br>4    were trying to quickly get me out of there.<br>5    Nobody was saying a word and then it just --<br>6    they weren't answering my question<br>7    basically.  I said okay, fine, let's pay the<br>8    restocking fee.  I added it up and it was --<br>9    even with the restocking fee it was $59<br>10   less.<br>11   MR. BRAUNSTEIN:<br>12       Or 49.<br>13 A.   59.  So I didn't feel like making a big<br>14   issue out of it after that.<br>15 MS. DAUGHERTY:<br>16 Q.    There's no question before you right now,<br>17   sir.  Take a look at Exhibit C now.<br>18       (Document submitted)<br>19 A.   Okay.<br>20 Q.    Do you recognize this document?<br>21 A.   Yes.<br>22 Q.    Tell me what this document is, please?<br>23 A.   This was the receipt for when I went in<br>24   there on the 20th giving back the --<br>25   returning the camera and the 15 percent | 1          THOMAS JERMYN<br>2    that you purchased the camera?<br>3 A.   No.<br>4 Q.    And have you been in the store since that<br>5   date?<br>6 A.   I think I might have bought a lens cap there<br>7   or lens cleaner, lens paper, some little<br>8   things.  It's a good store for that kind of<br>9   stuff.<br>10 Q.   So since May 20th, 2005 you maybe have been<br>11   in the store a couple of times?<br>12 A.  Yes.<br>13 Q.   Made a couple of small purchases?<br>14 A.  Yes.<br>15 Q.   Do you know whether or not Tristate has a<br>16   Price Match Policy?<br>17 A.  I'm not sure.<br>18 Q.   Had you purchased anything at Tristate<br>19   before purchasing the D70?<br>20 A.  Yes.<br>21 MR. BRAUNSTEIN:<br>22       Objection.  Asked and answered.  You<br>23   can answer.<br>24 A.  Yes.  Like I said, I think I might have<br>25   bought a camera bag there, small things like |

| Page 103 | Page 105 |
|---|---|
| 1          THOMAS JERMYN<br>2    restocking fee was charged to my account.<br>3 Q.    The net return then was $1,107.96?<br>4 A.   Yes.  Correct.  I didn't bring back the<br>5   battery.<br>6 Q.    Or the i-Trip?<br>7 A.   Yes.<br>8 MS. DAUGHERTY:<br>9       Off the record.<br>10<br>11       (OFF THE RECORD DISCUSSION)<br>12<br>13 Q.   You then went to Tristate after Best Buy;<br>14   correct?<br>15 A.  Yes.<br>16 Q.   And you purchased the camera, the same exact<br>17   camera, D70 at Tristate?<br>18 A.  Yes.<br>19 Q.   You did not order the camera online?<br>20 A.  No.<br>21 Q.   From Tristate?<br>22 A.  No.<br>23 Q.   You just purchased it at the store?<br>24 A.  Yes.<br>25 Q.   Have you shopped at Tristate since the date | 1          THOMAS JERMYN<br>2    lens paper, like some lens cleaner, things<br>3   like that.  It's a good basic photography<br>4   supply store.<br>5 MS. DAUGHERTY:<br>6 Q.    Do you know the address of Tristate?<br>7 A.   Yes.  It's at the corner of 20th and 6th<br>8   Avenue, so there's two addresses.  They have<br>9   a 6th Avenue address and also a 20th Street<br>10   address.<br>11 Q.   When you went into Tristate, did you take a<br>12   copy of the online advertisement with you?<br>13 A.  No.<br>14 Q.   Did you ever see a copy of Exhibit B, which<br>15   is a Tristate advertisement, in the Tristate<br>16   store before you purchased that camera?<br>17 A.  No.<br>18 Q.   So the only place you saw that advertisement<br>19   was online?<br>20 A.  Right.<br>21 Q.   And I believe you stated you thought that<br>22   you spoke to the salesperson at Tristate<br>23   about the prices online being the same as in<br>24   the store?<br>25 A.  Yes. |

27 (Pages 102 to 105)

THOMAS JERMYN,  MAY 2, 2008

Page 110

```
 1          THOMAS JERMYN
 2     just purchase it from the salesclerk?
 3  A.   Salesclerk.
 4  Q.   So if I understand what you told me, the
 5     only time you spoke with a manager at Best
 6     Buy in your three visits between May 13th
 7     and May 20th was the very last time when you
 8     attempted to return the camera; is that
 9     correct?
10  A.   Correct.
11  Q.   Now, did you ever call Best Buy Customer
12     Service?
13  A.   No.
14  Q.   Did you ever escalate the problem to a
15     higher level other than talking to that
16     manager? I guess other than bringing this
17     lawsuit as well?
18  A.   No.
19  Q.   You understand what I'm asking, did you ask
20     to speak to additional management when you
21     were in there that day?
22  A.   How many levels -- (interrupted)
23     MR. BRAUNSTEIN:
24        Listen to the question.
25  A.   No. When they sent the first manager out
```

Page 111

```
 1          THOMAS JERMYN
 2     and he looked at me like I'm from Mars, I
 3     didn't think I could go much further than
 4     that.
 5  MS. DAUGHERTY:
 6  Q.   Did you call any Best Buy corporate
 7     telephone number to complain about this
 8     situation?
 9  A.   No.
10  Q.   Did you complain about this to any other
11     entities such as the Better Business Bureau?
12  A.   No.
13  Q.   Did you complain about it to the Department
14     of Commerce?
15  A.   No.
16  Q.   It's true that of all the people that you
17     spoke to in your three visits between May
18     13th and May 20th, you can't tell me the
19     names of any of these individuals; is that
20     right?
21  A.   I have a name -- don't I have a name that
22     was written down in pencil?
23     MR. BRAUNSTEIN:
24        You can't ask me.
25
```

Page 112

```
 1          THOMAS JERMYN
 2  MS. DAUGHERTY:
 3  Q.   You can't ask your attorney. Off the top of
 4     your head right now -- (interrupted)
 5  A.   I know I have something written down, but I
 6     don't have it with me. Simons I believe.
 7     It was a woman's name. She wrote 1-888-Best
 8     Buy.
 9  Q.   If we don't look at that document today,
10     I'll ask you to produce that to your
11     attorney.
12  A.   Okay.
13
14        (REQUESTED INFORMATION HERE)
15
16  Q.   Other than that name, do you have any names
17     of anyone else that you spoke with at Best
18     Buy during that period of time?
19  A.   No.
20  Q.   Do you agree that it would have been helpful
21     to get the names of the individuals that you
22     talked to who made oral representations to
23     you?
24     MR. BRAUNSTEIN:
25        Objection to the form. You can
```

Page 113

```
 1          THOMAS JERMYN
 2     answer.
 3  A.   Yes.
 4  MS. DAUGHERTY:
 5  Q.   Why did you not do that?
 6  A.   I think I did. In fact, I remember asking
 7     and no one wanted to give me their name. It
 8     was one thing after another when I was in
 9     the store. It was a total insult to my
10     intelligence -- (interrupted)
11     MR. BRAUNSTEIN:
12        Answer the question.
13  MS. DAUGHERTY:
14  Q.   Is the answer yes or no?
15  A.   Yes.
16  Q.   You did get other names?
17  A.   No, I tried to get names, but I didn't get
18     any names.
19  Q.   You have been to Best Buy on a number of
20     occasions?
21  A.   Yes.
22  Q.   Are you aware Best Buy personnel employees
23     wear name badges?
24  A.   I don't remember seeing anyone with a name
25     badge.
```

29 (Pages 110 to 113)

THOMAS JERMYN,  MAY 2, 2008

Page 118

1         THOMAS JERMYN
2   say that? I kept focusing on that and they
3   wouldn't listen to me. I got angry and I
4   don't remember if they threatened to take me
5   out of the store or call the cops on me, but
6   I realized I might leave the store.
7  Q.   Did you raise your voice in anger?
8  A.   Yes, definitely.
9  Q.   You mentioned "they" many times. From what
10  you've told me, you spoke with one person at
11  the customer service desk and then --
12  (interrupted)
13 A.  There were other people gathering around --
14  (interrupted)
15 Q.  There's no question pending yet. I have to
16  ask it in its entirety. In addition to the
17  one person at the customer service desk, you
18  told me you spoke to a manager. Is there
19  anybody else that you spoke to that day at
20  Best Buy?
21 A.  By the time I left it seemed like there were
22  five people on the other side of that table.
23  From the clerk to the salesperson maybe, I
24  didn't -- it all kind of blended together.
25  I don't recall who specifically the

Page 119

1         THOMAS JERMYN
2   salesperson was.
3  MR. BRAUNSTEIN:
4    We are talking about May 20th now.
5 A.   When I left the store it could have been the
6  person that sold me the camera, could have
7  been the cashier, could have been the
8  customer service person. There were like
9  four or five people, including the manager
10  on the other side of the table against me.
11  I was trying to get my point across, it
12  wasn't just one person. Nobody was really
13  saying anything.
14 MS. DAUGHERTY:
15 Q.  Did any other person -- (interrupted)
16 A.  Was there any other person that I remember?
17  No, it was just they were categorically
18  denying everything I said. He said no, we
19  don't honor this here, we only honor major
20  chains. I was trying to get at what do you
21  define as a major chain? What's a major
22  chain, what's a major chain and nobody
23  answered me.
24 Q.  When you said there were multiple people
25  gathering behind this customer service desk,

Page 120

1         THOMAS JERMYN
2   did any of them say anything to you?
3 A.   No.
4 Q.   They just stood there and watched?
5 A.   Stood there and watched. It was almost like
6  they were trained.
7  MS. DAUGHERTY:
8    Off the record.
9
10    (OFF THE RECORD DISCUSSION)
11
12 Q.  You mentioned that you just said it was like
13  they were trained and you mentioned saying
14  this seemed like a conspiracy. Do you
15  remember saying that?
16 A.  Yes.
17 Q.  You have no evidence that there was any type
18  of conspiracy going on at Best Buy, do you?
19  MR. BRAUNSTEIN:
20    Objection to the form. You can
21  answer.
22 A.  No. It was just odd that nobody was
23  answering my questions and it was just
24  silence, silence, silence and it took about
25  five minutes for the guy to come out. It

Page 121

1         THOMAS JERMYN
2   was just like I said, as if they were
3  observing some protocol for this type of
4  situation because nobody would say a word to
5  me. You would think in most situations a
6  staff member of the store would try to calm
7  down an irate customer.
8 MS. DAUGHERTY:
9 Q.   Would you agree you were irate?
10 A.  Yes.
11 Q.  When the manager came, you said you were
12  describing how you demanded more explanation
13  and he said nothing?
14 A.  Right.
15 Q.  For the first couple times is what I
16  understand?
17 A.  Yes.
18 Q.  Was he just quiet?
19 A.  Yeah. He just listened to me. He made me
20  state my case. I said it succinctly that I
21  bought the camera here, here is your Price
22  Match Guarantee, please match it, I found
23  this at Tristate. I'd love to be your
24  customer, can you do this for me and he said
25  no, we can't do that.

31 (Pages 118 to 121)

THOMAS JERMYN,  MAY 2, 2008

| Page 122 | Page 124 |
|---|---|
| 1          THOMAS JERMYN | 1          THOMAS JERMYN |
| 2 Q.  That's when you asked for an explanation? | 2 A.  No. |
| 3 A.  Yes. | 3 Q.  Unless they were answering a question that |
| 4 Q.  And he just stood there and looked at you? | 4       you posed, that you already described to me? |
| 5 A.  Yes.  Look at this, we matched this, here is | 5  MR. BRAUNSTEIN: |
| 6      the ad you need, why can't you do this. | 6          Other than previous testimony? |
| 7 Q.  Other than him saying to you, no, we don't | 7  MS. DAUGHERTY: |
| 8      do it or in some way saying that and telling | 8          Right. |
| 9      you that it's because Best Buy only matches | 9 A.  Yes. |
| 10     retail chains, do you remember -- | 10 Q.  Have you ever read the Price Match Policy in |
| 11     (interrupted) | 11      full? |
| 12  MR. BRAUNSTEIN: | 12 A.  Yes. |
| 13          Major chains. | 13 Q.  Your testimony is that you understood the |
| 14  MS. DAUGHERTY: | 14      Price Match Policy? |
| 15          Sorry. | 15 A.  Yes. |
| 16 Q.  Major chains, do you remember anything else | 16 Q.  To the best of your knowledge? |
| 17     specifically that this manager said to you? | 17 A.  Yes, sure, yeah. |
| 18 A.  No.  Other than just go ahead, sue us, | 18  MS. DAUGHERTY: |
| 19     things like that. | 19          Mark this. |
| 20 Q.  Do you personally -- other than the blogs | 20 |
| 21     you read, and I'm talking personally, do you | 21       (PRICE MATCH GUARANTEE WAS RECEIVED |
| 22     know someone who tried to get the benefit of | 22       AND MARKED AS DEFENDANT'S EXHIBIT E |
| 23     Best Buy's Price Match? | 23       FOR IDENTIFICATION) |
| 24 A.  No. | 24 |
| 25 Q.  When I say that, I mean either successfully | 25 Q.  Sir, showing you what has been marked as |

| Page 123 | Page 125 |
|---|---|
| 1          THOMAS JERMYN | 1          THOMAS JERMYN |
| 2      got the benefit of the Price Match meaning | 2      Defendant's Exhibit E.  Take a moment to |
| 3      it worked or had a situation wherein they | 3      review that document. |
| 4      were denied the benefit of Price Match, you | 4          (Document submitted) |
| 5      don't know anyone? | 5 A.  Okay. |
| 6 A.  No, either one. | 6 Q.  Do you know what that is? |
| 7 Q.  You never wrote any letters or e-mails to | 7 A.  Yes. |
| 8      Best Buy or any other entities complaining | 8 Q.  What is that document? |
| 9      of this? | 9 A.  Price Guarantee Customer FAQs. |
| 10 A.  No. | 10 Q.  Is this a copy of the Price Match Policy you |
| 11 Q.  It's your testimony that you thought it was | 11      had in your possession that you brought into |
| 12     sufficient to go to the manager and I think | 12      Best Buy on May 20th? |
| 13     you said you wouldn't get anywhere if you | 13 A.  I'm not sure because I think the one that I |
| 14     called or took it to a higher level? | 14      had might have been in color.  It was |
| 15 A.  Right. | 15      different kind of paper, but I'm not sure. |
| 16 Q.  You had a copy of the Best Buy Price Match | 16      It says basically the same thing. |
| 17     Policy and I believe that's what you took in | 17 Q.  There's some handwriting at the bottom.  Do |
| 18     on May 20th; is that right? | 18      you see that? |
| 19 A.  The copy that you mentioned, yeah.  It | 19 A.  Yes. |
| 20     wasn't the 20th, it was before that.  That I | 20 Q.  There's a name? |
| 21     brought in? | 21 A.  Yes. |
| 22 Q.  Yes. | 22 Q.  Is that your handwriting? |
| 23 A.  Yes. | 23 A.  No. |
| 24 Q.  Did anybody explain the Price Match Policy | 24 Q.  The name -- I don't know what this first |
| 25     to you in terms of what it covered? | 25      name is, starts with a G? |

32 (Pages 122 to 125)

THOMAS JERMYN,  MAY 2, 2008

| Page 130 |
|---|
| 1        THOMAS JERMYN |
| 2    feel like pursuing anything with Best Buy. |
| 3    I didn't want to ever utter the name again |
| 4    after what I went through. |
| 5 Q.    To the best of your recollection, you got |
| 6    this document after May 20th, 2005 or you |
| 7    had the name written on the document after |
| 8    May 20th, 2005? |
| 9 A.    Yes. |
| 10 Q.    You just said, sir, you didn't want to hear |
| 11    the name Best Buy again, you didn't feel it |
| 12    would be useful at all to follow up on this. |
| 13    Why didn't you go into the store to get this |
| 14    person's name? |
| 15 A.    I'm not sure what my rationale was at that |
| 16    time. I might have been trying to pursue it |
| 17    or thinking I might want to do something on |
| 18    it. It was sitting on my desk and I made a |
| 19    few calls. Until these guys came along it |
| 20    wasn't really going anywhere. The camera |
| 21    worked. I kind of put it behind me after a |
| 22    little while. |
| 23 Q.    Is it fair to say earlier in your testimony |
| 24    you didn't follow up with any person higher |
| 25    than management at Best Buy with regard to |

| Page 131 |
|---|
| 1        THOMAS JERMYN |
| 2    this incident? |
| 3 A.    Yes. |
| 4 Q.    It's true at some point after May 20th you |
| 5    went into a Best Buy store; right? |
| 6 A.    No. |
| 7    MR. BRAUNSTEIN: |
| 8        Listen to the question. |
| 9 A.    I'm not sure. |
| 10 MS. DAUGHERTY: |
| 11 Q.    You don't know if you went into a Best Buy |
| 12    store? |
| 13 A.    This could have been done on the 20th. It |
| 14    could have been done the moment before I |
| 15    blew up or when somebody put their name on |
| 16    here. I don't remember. I just see |
| 17    someone's name on there. They are not in |
| 18    the habit of putting their name -- I |
| 19    remember asking somebody their name |
| 20    throughout this entire ordeal. I don't |
| 21    remember if I ever went back into the 23rd |
| 22    Street store. It might have been on the |
| 23    20th when I did this. I'm not exactly sure |
| 24    though. |
| 25 |

| Page 132 |
|---|
| 1        THOMAS JERMYN |
| 2    MR. BRAUNSTEIN: |
| 3        Listen to the question. |
| 4 MS. DAUGHERTY: |
| 5 Q.    You don't know whether or not you went back |
| 6    into the 23rd Street store, the Chelsea |
| 7    store at any time after May 20th until let's |
| 8    say the rest of the year? |
| 9 A.    I'm not sure. |
| 10 Q.    In any event, you did not call this 1-888 |
| 11    number? |
| 12 A.    No. If I did anything, I just went online. |
| 13    MR. BRAUNSTEIN: |
| 14        Listen to the question. The question |
| 15    is did you call this number? |
| 16    THE WITNESS: |
| 17        No. |
| 18    MR. BRAUNSTEIN: |
| 19        Listen to the question and answer the |
| 20    question. |
| 21 MS. DAUGHERTY: |
| 22 Q.    This is the version of the Price Match |
| 23    Policy that you think Best Buy violated? |
| 24    MR. BRAUNSTEIN: |
| 25        Object to the form, but you can answer |

| Page 133 |
|---|
| 1        THOMAS JERMYN |
| 2    over objection. |
| 3 A.    Yes. |
| 4 MS. DAUGHERTY: |
| 5 Q.    As a class representative of this class |
| 6    action, this is the substance of the policy |
| 7    that you believe was violated? |
| 8    MR. BRAUNSTEIN: |
| 9        Same Objection. You can answer. |
| 10 A.    Yes. |
| 11 MS. DAUGHERTY: |
| 12 Q.    I'm going to go ahead and have you look |
| 13    through this document. If you need a |
| 14    minute, that's fine. Tell me if you see |
| 15    anything relating to online price matching. |
| 16 A.    I don't see anything that says anything |
| 17    about online price matching. Oh, yeah, it |
| 18    says -- no, that says processed online. |
| 19 Q.    Other than that, sir, anything else that you |
| 20    see relating that mentioned online price |
| 21    matching? |
| 22 A.    No. |
| 23 Q.    I'll represent to you that Exhibit E and |
| 24    what we will marked as Exhibits F and G were |
| 25    sent to me as one exhibit, as one document. |

34 (Pages 130 to 133)

THOMAS JERMYN,  MAY 2, 2008

|  | Page 150 |
|---|---|

```
1              THOMAS JERMYN
2  Q.   Were you satisfied with the products you
3       purchased at Best Buy?
4  A.   Yes.
5  Q.   Other than CDs, what types of products have
6       you purchased at Best Buy?
7  A.   Maybe like a stereo, maybe a card for a
8       camera.
9  Q.   Had you ever returned anything to Best Buy?
10 A.   No.
11 Q.   Never before?
12 A.   No.
13 Q.   The first product you ever returned to Best
14      Buy was this Nikon camera?
15 A.   Yes.
16 Q.   So obviously then would it be fair to say
17      you've already been satisfied with your
18      purchases from Best Buy?
19 A.   Yes.
20 Q.   Have you stepped foot in a Best Buy store
21      since May 2005?
22      MR. BRAUNSTEIN:
23          Other than what he may have testified
24      to already?
25
```

|  | Page 151 |
|---|---|

```
1              THOMAS JERMYN
2       MS. DAUGHERTY:
3           Yes, other than what he may have
4       testified to that was in connection with
5       this particular incident.  I know he said he
6       might have gone back to get the name.
7  A.   No.
8  Q.   Other than in either May 2005 or after to
9       get the name of Miss Simons, you haven't
10      stepped foot in a Best Buy store?
11 A.   No.
12 Q.   Have you ever purchased anything from a Best
13      Buy?
14 A.   Yes.
15 Q.   I'm sorry, since May 2005?
16 A.   No.
17 Q.   How about online from Best Buy?
18 A.   No.
19 Q.   Do you plan to shop at Best Buy again in the
20      future?
21 A.   No.
22 Q.   Do you have family that shops at Best Buy?
23 A.   No.
24 Q.   Did they before this incident?
25 A.   Yes.
```

|  | Page 152 |
|---|---|

```
1              THOMAS JERMYN
2  Q.   Where else do you shop for electronics now?
3  A.   PC Richards, J&R Music.  That's about it.
4  Q.   You have never -- (interrupted)
5  A.   Oh, Wal-Mart.
6  Q.   Do you know whether any of those stores has
7       a Price Match Guarantee?
8  A.   Wal-Mart does.
9  Q.   You have never tried to utilize that though?
10 A.   No.
11 Q.   Ever been a member of Best Buy's Reward
12      Zone?
13 A.   No.
14 Q.   We have looked at a number of exhibits
15      today.  Do you have anything else in your
16      possession relating to the May 2005
17      transaction?
18 A.   No.
19 Q.   Have you reviewed Best Buy's document
20      requests?
21 A.   Yes.
22 Q.   Do you know of any other documents that you
23      may have in your possession that are
24      responsive to those document requests that
25      you have not provided to your attorney?
```

|  | Page 153 |
|---|---|

```
1              THOMAS JERMYN
2  A.   No.
3  Q.   How would you define yourself, the class of
4       persons you hope to represent in this case?
5  A.   People that have depended on and relied upon
6       Best Buy's representation for being a low
7       price electronics and equipment vender and
8       gone in there and been stuck and been in the
9       same position and situation that I'm in by
10      buying something and thinking they are
11      getting the lowest price and I would like to
12      prevent that so people know maybe they
13      should shop around before they buy at Best
14      Buy.  And if they have been refused like me
15      and had to pay the restocking fee, then they
16      should be compensated for that.
17 Q.   So the class of persons you hope to
18      represent have been affected in some way by
19      the Price Match Policy?
20 A.   The failure to honor it.
21 Q.   When is the time last -- when was the time
22      frame --
23      MS. DAUGHERTY:
24          Strike that.
25 Q.   What is the time frame in which the class of
```

39 (Pages 150 to 153)

THOMAS JERMYN,  MAY 2, 2008

| | |
|---|---|
| Page 158 | Page 160 |

**Page 158**

1  THOMAS JERMYN
2  you -- let's say for some reason they were
3  denied so they never ended up purchasing
4  from Best Buy?
5  MR. BRAUNSTEIN:
6      Hold on.  Off the record.
7
8      (OFF THE RECORD DISCUSSION)
9
10  MS. DAUGHERTY:
11      I will withdraw the last question.
12 Q.  You are talking about people that would
13  bring in an advertisement to Best Buy --
14  (interrupted)
15 A.  Say there's a TV -- (interrupted)
16  MR. BRAUNSTEIN:
17      Let her ask the question.
18 MS. DAUGHERTY:
19 Q.  An employee would say this would not be
20  valid for the Price Match so they never
21  ended up purchasing from Best Buy?
22 A.  Yes.
23 Q.  And those are the people that you feel
24  should be in the class, yes or no?
25 A.  Yes.

**Page 160**

1  THOMAS JERMYN
2  MR. BRAUNSTEIN:
3      Object to the form.  You can answer.
4  MS. DAUGHERTY:
5 Q.  Right?
6 A.  Yes.
7 Q.  So you would agree with me that it could be
8  based on what you said you were told because
9  Best Buy only matches major chains?
10 A.  According to what they told me, yes.
11 Q.  You agreed that there could be denials of
12  the Price Match Policy because of the time
13  frame, thirty days or fourteen days?
14 A.  Yes.
15 Q.  You would agree with me that there could be
16  other denials of the Price Match Policy
17  because the product was purchased online at
18  a certain time?
19 A.  Yes.
20 Q.  And you also agree with me when we looked at
21  these Price Match versions in Exhibits E and
22  F they differ?
23 A.  Right.
24 Q.  And are you aware whether or not Best Buy
25  changed its Price Match Policy at all in

| | |
|---|---|
| Page 159 | Page 161 |

**Page 159**

1  THOMAS JERMYN
2 Q.  I believe you said that there are a lot of
3  difference with circumstances and the Best
4  Buy match; right?
5 A.  Gift cards, things like that.
6  MR. BRAUNSTEIN:
7      Objection to the form.  You can
8  answer.
9 A.  Gift cards, thing like that.
10 MS. DAUGHERTY:
11 Q.  In somebody else's case there could have
12  been gift cards, rebate issues?
13 A.  Yes.
14 Q.  They could have purchased the product like
15  you?
16 A.  Yes.
17 Q.  And there's people that you said that didn't
18  end up purchasing the product because they
19  brought in an ad and Best Buy said they
20  wouldn't match it for one reason or another;
21  right?
22 A.  Right.
23 Q.  You would agree with me too that there could
24  be a variety of reasons why a Price Match
25  was not met; right?

**Page 161**

1  THOMAS JERMYN
2  that period of time?
3 A.  I'm not aware of that.
4 Q.  So we have talked about a number of factors.
5  You agree with me that there's a lot of
6  different circumstances?
7 A.  Yes.
8 Q.  And your class would take account for all of
9  these different circumstances; right?
10 A.  If it would become burdensome, no.  We would
11  limit it to the people that just got charged
12  the restocking fee.
13 Q.  Your testimony is that all of these people
14  should be included?
15 A.  Yes.
16 Q.  You realize there's all these different
17  circumstances such as different reasons to
18  be denied the Price Match Policy?
19 A.  Yes.
20 Q.  Different advertisements, you realize people
21  could bring in different advertisements from
22  different stores?
23 A.  Yes.
24 Q.  You realize people could bring in
25  advertisements from other stores, but they

41 (Pages 158 to 161)

THOMAS JERMYN,  MAY 2, 2008

|  | Page 162 |
| --- | --- |

1          THOMAS JERMYN
2    could get the Price Match Policy with an
3    online ad?
4  A.    Yes.
5  Q.    As a plaintiff you would represent all these
6    people?
7  A.    Yes.
8  Q.    You mentioned that you travel to Florida and
9    South Carolina for work?
10 A.    Yes.
11 Q.    You understand that if your class is
12    certified that it will be in litigation
13    venued here in the Southern District of New
14    York?
15 A.    Yes.
16 Q.    You realize that there is time commitments
17    associated with that?
18 A.    Yes.
19 Q.    With the time commitment that you have with
20    your job and travel you would be able to
21    accommodate that?
22 A.    Yes.
23 Q.    Why else do you think you are qualified to
24    be the class representative?
25 A.    I'm an attorney.  I have twenty years of

|  | Page 163 |
| --- | --- |

1          THOMAS JERMYN
2    experience and I'm uniquely situated that I
3    was wronged by Best Buy so I can understand
4    the way the company treats people in my
5    situation and I'll be a good advocate in
6    their behalf.
7  Q.    It's fair to say you are not involved in
8    consumer litigation?
9  A.    Correct.
10 Q.    How would your class involve those people
11    who came into Best Buy with an ad and were
12    turned away from some reason saying that the
13    Price Match Policy would not be a benefit?
14    MR. BRAUNSTEIN:
15        Object to the form.
16    MS. DAUGHERTY:
17        I didn't complete the question.  Let
18    me start over.
19 Q.    You did say, correct me if I'm wrong, you
20    did say your class could include people that
21    come into Best Buy with an advertisement and
22    they would say that the Price Match
23    Guarantee would not apply; is that correct?
24 A.    Yes.
25 Q.    And you would agree then that those people

|  | Page 164 |
| --- | --- |

1          THOMAS JERMYN
2    likely do not have any paper documentation
3    with Best Buy because they never purchased
4    anything at Best Buy?
5  A.    Yes.
6  Q.    You would agree it would be hard to quantify
7    the damages that those people suffered?
8  A.    Right.
9  Q.    Would you agree then that in that situation
10    it would perhaps be difficult to group them
11    with other situations such as yours?
12 A.    Yes.
13    MR. BRAUNSTEIN:
14        October to the form.
15 MS. DAUGHERTY:
16 Q.    You had testified earlier about various oral
17    representations made to you by Best Buy
18    personnel?
19 A.    Yes.
20 Q.    You would agree with me that the same oral
21    representations that were made to you are
22    very likely not the exact same
23    representations word for word that were made
24    for someone else?
25

|  | Page 165 |
| --- | --- |

1          THOMAS JERMYN
2    MR. BRAUNSTEIN:
3        Objection to the form.  Calls for
4    speculation.  You can answer over objection.
5  A.    Hard to tell.  I have no way of knowing.
6  MS. DAUGHERTY:
7  Q.    Are you aware of a secret intranet site that
8    Best Buy operates?
9  A.    I read about that.
10 Q.    Tell me what you know about that?
11 A.    They would have one website in the stores
12    running that was a mirror, like a copy so
13    people would look on it and it was different
14    from the actual internet site and it had
15    different prices.  I don't know if they had
16    to pay damages on that.  It was misleading
17    to the consumer.  My attorney uncovered
18    something on that, about that, and I read
19    about it in the attachments to the complaint
20    or the interrogatories.
21 Q.    It's true that you do not have a separate
22    cause of action in your complaint and you're
23    not alleging a separate cause of action
24    based on any type of violation or anything
25    with regard to this secret intranet site;

42 (Pages 162 to 165)

# EXHIBIT NO. 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THOMAS JERMYN, on behalf of himself                         :
and all others similarly situated,                               CIVIL ACTION NO.  08 CV 00214

           Plaintiff,                          :     ECF ACTION

    -against-                                           :     **DECLARATION OF**
                                                                 **JENNIFER G. DAUGHERTY**
BEST BUY STORES, L.P.,                                       :     **IN SUPPORT OF BEST BUY STORES,**
                                                                 **L.P.'S MEMORANDUM OF LAW**
        Defendant.                         :     **IN OPPOSITION TO PLAINTIFF'S**
                                                                 **MOTION FOR CLASS CERTIFICATION**

                                            **FILED UNDER SEAL**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**EXHIBIT 2**

**CONFIDENTIAL INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**
**CASE NO. 08-CV-00214**
**(JUDGE COLLEEN MCMAHON)**
**THIS ENVELOPE IS NOT TO BE OPENED NOR THE**
**CONTENTS THEREOF DISPLAYED, COPIED OR REVEALED**

**ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**
Anne M. Lockner (admitted *pro hac vice*)
Jennifer G. Daugherty (admitted *pro hac vice*)

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402–2015
Tel:  (612) 349–8500
Fax:  (612) 339–4181

ATTORNEYS FOR DEFENDANT
BEST BUY STORES, L.P.

## CERTIFICATE OF SERVICE

Case Name:     **THOMAS JERMYN**, on behalf of himself and all others similarly situated v.
               **BEST BUY STORES, L.P.**

Court File No:  **08-00214**

I hereby certify that on June 26, 2008, I electronically filed the foregoing documents: DECLARATION OF JENNIFER G. DAUGHERTY, with EXHIBIT 1, AND EXHIBIT 2 (Filed Under Seal), IN SUPPORT OF DEFENDANT BEST BUY STORES, L.P.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION (Filed Under Seal), and this Certificate of Service with the Clerk of Court using the CM/ECF System, which shall send notification of such filing to the following:

| Gary S. Graifman | ggraifman@kgglaw.com |
| Todd C. Norbitz | tnorbitz@foley.com |

In addition, the preceding documents were served in their entirety via electronic email and first-class mail this 26th day of June upon the following:

Gary S. Graifman, Esq.
Michael L. Braunstein, Esq.
KANTROWITZ, GOLDHAMER
     & GRAIFMAN, P.C.
747 Chestnut Ridge Road, Suite 200
Chestnut Ridge, NY 10977-6216

Todd C. Norbitz, Esq.
Yonaton Aronoff, Esq.
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016

*s*/ Jennifer G. Daugherty
Jennifer G. Daugherty